# In the United States Court of Federal Claims

No. 14-394C
(Filed Under Seal: July 25, 2014)
(Reissued for Publication: August 11, 2014)*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| CEDGE SOFTWARE CONSULTANTS, LLC, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * Bid Protest; Cross-Motions for Judgment |
| THE UNITED STATES, | * on the Administrative Record; Assignment |
| | * of a Deficiency; Removal From |
| Defendant, | * Competitive Range; Discussions |
| | * |
| and | * |
| | * |
| TRIDENT TECHNOLOGIES, LLC, | * |
| | * |
| Defendant-Intervenor. | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

James Y. Boland, Tysons Corner, VA, for plaintiff.

Lisa L. Donahue, United States Department of Justice, Washington, DC, for defendant.

W. Brad English, Huntsville, AL, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Judge

In this bid protest, plaintiff asserts that the procuring agency improperly excluded it from the competitive range, conducted inadequate discussions, and evaluated the offerors' proposals disparately on a key factor. The parties have cross-moved for judgment on the administrative record. For the reasons set forth below, the court denies plaintiff's motion and grants the motions of defendant and defendant-intervenor.

---

\* The court provided the parties with an opportunity to suggest redactions to this ruling, but in an August 11, 2014 joint status report, they indicated that no redactions were necessary.

## I. BACKGROUND

### A. Solicitation

On June 12, 2013, the United States Transportation Command ("USTRANSCOM") issued solicitation number HTC711-13-R-D003 for an Enterprise Architecture, Data, and Engineering contract to meet the information technology engineering needs of three United States Department of Defense components located at Scott Air Force Base, Illinois: USTRANSCOM; the United States Air Force Air Mobility Command Directorate of Command, Control, Communications, and Computer Information Systems; and the Military Surface Deployment and Distribution Command Communications Directorate (collectively, "the procuring agencies").[1]  AR 294, 613-15.  More specifically, USTRANSCOM sought to procure:

> an integrated enterprise architecture from the enterprise level down through the solution level and across solution level architectures.  Integration is achieved through the architecture tool suite, the use of standardized templates and guidelines, training, and the architecture review process.  The work effort will support analytical services required to support and implement . . . operational and system requirements solutions.  The Contractor must possess a comprehensive understanding of the DOD Architecture Framework (DODAF), the Federal Enterprise Architecture Framework (FEAF) and the relationships/dependencies between architecture models to support assigned projects.  The scope of the architecture and data management services . . . includes the operational and system perspectives of Command and Control (C2), planning, transportation, logistics, and business support system domains.  Using established strategic vision documentation, the Contractor will provide architecture and data management support.  . . .  Systems administration of the tools that house the architecture and data artifacts is also required.

Id. at 615.  The Performance Work Statement ("PWS") included in the solicitation contains a description of nine tasks for which the contractor would be responsible:  contract management; enterprise architecture development and maintenance; data management; modernization, development, support, and security for enterprise architecture tools; enterprise engineering support; alternate functional area communications and computer systems management duties; information support plan development; agile development; and prototyping.  Id. at 615-48.

USTRANSCOM intended to award a single indefinite-delivery/indefinite-quantity contract "to the responsible offeror whose offer conforming to the solicitation [would] be most advantageous to the Government, price and other factors considered."  Id. at 682, 758.  The four factors to be considered were technical capability, staffing approach, past performance, and price.

---

[1]  The court derives the facts in the background section from the administrative record ("AR") and documents specifically referenced in the administrative record.

Id.  Technical capability was significantly more important than the other two nonprice factors, which were equally important.  Id.  Combined, the nonprice factors were approximately equally important as price.  Id.  Given the weight assigned to each factor, offerors were advised that the contract could be awarded to "a higher rated, higher priced offeror," but that USTRANSCOM would "not pay a price premium that it consider[ed] to be disproportionate to the benefits associated with the proposed margin of service superiority."  Id. at 682.  Offerors were further advised that USTRANSCOM might "conduct discussions with offerors" and "limit the competitive range for purposes of efficiency."  Id.

The technical capability factor had four subfactors; in "descending order of importance," they were technical capability, enterprise architecture development, enterprise engineering support, and staffing approach.  Id.  Of particular relevance in this protest are the first two subfactors:

Subfactor 1:  Technical capability–The Offeror shall submit a sound plan for accomplishing the requirements of the PWS.  The plan should provide a logical approach that ensures timely support for all tasks as described in the PWS.

Subfactor 2:  Enterprise Architecture Development (Task 2)–Offerors shall submit an integrated model subset addressing the following:

(a) The Offeror shall develop and submit Department of Defense Architecture Framework (DODAF) v2.02 models based on the attached use case . . . and applicable reference listed in sub-paragraph (b), below.  Models required for submission:

1. OV-5a, Operational Decomposition Tree
2. OV-6c, Event-Trace Description (Developed using BPMN)[2]

---

[2]  "The OV-6c provides a time-ordered examination of the Resource Flows as a result of a particular scenario. . . .  Operational Event/Trace Descriptions, sometimes called sequence diagrams, event scenarios, or timing diagrams, allow the tracing of actions in a scenario or critical sequence of events."  OV-6c: Event-Trace Description, http://dodcio.defense.gov/ TodayinCIO/DoDArchitectureFramework/dodaf20_ov6c.aspx (last visited July 11, 2014), quoted in AR 3718.  Offerors were to develop their OV-6c models using BPMN, i.e., Business Process Model and Notation, a standardized method of graphically representing internal business procedures.  Object Management Group, Business Process Model and Notation (BPMN) Version 2.0 1, 21 (2011), http://www.omg.org/spec/BPMN/2.0/ ("BPMN 2.0").

The scenario to be depicted in the OV-6c was the process described in the use case attached to the solicitation.  AR 682.  "In BPMN, a Process is depicted as a graph of Flow Elements, which are a set of Activities, Events, Gateways, and Sequence Flow that adhere to a finite execution semantics."  BPMN 2.0, supra, at 502.  A sequence flow is "[a] connecting

3. AV-2, Integrated Dictionary

(b) Reference Materials.  The following reference materials will be used by the evaluation team to review submissions under this subfactor:

1. DODAF, Version 2.02
2. Enterprise Architecture Planning, Developing a Blueprint for Data, Applications, and Technology, Steven H. Spewak, and Steven C. Hill[,] A Wiley–QED publication[,] 1992
3. The Practical Guide to Business Process Reengineering Using IDEF0, Clarence Feldmand, Dorset House Publishing, 1998
4. BPMN Method & Style, Bruce Silver

Id. at 682-83 (footnote added).  The "attached use case" mentioned in the description of the second subfactor was a hypothetical situation in which a grandmother planned to install an in-ground swimming pool in her backyard, and included the following information:  (1) a description of the stakeholders and interested parties; (2) a "main success scenario" containing fifty-one steps; (3) a number of "extensions," i.e., deviations from the main success scenario; (4) a list of the technologies required for the project, such as a backhoe and survey equipment; and (5) a list of data required for the project, such as bids and contracts.  Id. at 434-38.

USTRANSCOM described how it would evaluate submitted proposals in section M of the solicitation.  Id. at 758-62.  With respect to the two technical capability subfactors at issue in this protest, section M provided:

Factor 1–Technical Capability

Measure of Merit, Subfactor 1:  This Measure of Merit is met when the offeror has submitted a plan that provides a logical approach that ensures timely support for all tasks as described in the PWS.  The plan reflects a clear understanding of the work.

Measure of Merit, Subfactor 2:  The Measure of Merit for Subfactor 2 is met when the offeror submits a fully integrated model subset based on this scenario.

. . . .

---

object that shows the order in which activities are performed in a Process . . . ."  Id.; accord AR 3907 (containing an excerpt from Silver, BPMN Method & Style).  A gateway is "used to control how the Process flows . . . through Sequence Flows as they converge and diverge within a Process."  BPMN 2.0, supra, at 90.

Color ratings, as documented in the table below, will be used for the technical capability evaluation.  Subfactors 1-4 above will be evaluated separately and will be given individual color ratings.

| Color | Rating | Description |
|---|---|---|
| Blue | Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements.  The proposal contains multiple strengths and no deficiencies. |
| Purple | Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements.  Proposal contains at least one strength and no deficiencies. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements.  Proposal has no strengths or deficiencies. |
| Yellow | Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. |
| Red | Unacceptable | Proposal does not meet requirements and contains one or more deficiencies and is unawardable. |

Technical proposal risk is the assessment of technical risk, which is manifested by the identification of weakness(es), [and] considers potential for disruption of schedule, increased costs, degradation of performance, the need for increased Government oversight, or the likelihood of unsuccessful contract performance.  Risk will be assessed of the technical proposal and will be assigned one of the following proposal risk ratings:

| Rating | Description |
|---|---|
| Low | Has little potential to cause disruption of schedule, increased cost, or degradation of performance.  Normal contractor effort and normal Government monitoring will likely be able to overcome any difficulties. |

| Moderate | Can potentially cause disruption of schedule, increased cost, or degradation of performance.  Special contractor emphasis and close Government monitoring will likely be able to overcome difficulties. |
| High | Is likely to cause significant disruption of schedule, increased cost, or degradation of performance.  Is unlikely to overcome any difficulties, even with special contractor emphasis and close Government monitoring. |

Id. at 758-59.

## B.  Evaluation of Initial Proposals

USTRANSCOM received five proposals in response to its solicitation, including one from plaintiff CEdge Software Consultants, LLC ("CEdge") and another from defendant-intervenor Trident Technologies, LLC ("Trident").  Id. at 4084.  A Source Selection Evaluation Board ("SSEB") reviewed the proposals; identified the proposals' strengths, weaknesses, and deficiencies; and reached consensus ratings.

With respect to CEdge's proposal, the SSEB identified two strengths under the first technical capability subfactor–one relating to "the use of advanced penetration testing tools" and the other relating to "the use of the DataFlux tool."  Id. at 4009-10.  The SSEB noted no weakness or deficiencies, and ultimately assigned CEdge a purple/good rating for this subfactor.  Id.

In contrast, under the second technical capability subfactor, the SSEB identified one weakness, two significant weaknesses, and four deficiencies with CEdge's proposal.  Id. at 4011-13.  Of particular importance is the SSEB's evaluation of CEdge's OV-6c model.  The SSEB identified two deficiencies with this model, noting that the model "was not developed using BPMN" and "only provided a small subset of the fully dressed use case."  Id. at 4012.  Based on its review and evaluation, the SSEB assigned CEdge a red/unacceptable rating for this subfactor.  Id. at 4013.  It also assigned CEdge a moderate risk rating for the technical capability factor overall.  Id. at 4023-24.

Turning to Trident's proposal, the SSEB identified three strengths under the first technical capability subfactor–one pertaining to "the use of certified personnel in critical task areas," the second pertaining to a "demonstrated knowledge of design patterns," and the third pertaining to "the use of DataFlux."  Id. at 2560-61.  The SSEB noted one weakness and no deficiencies, and ultimately assigned Trident a blue/outstanding rating for this subfactor.  Id.

With respect to the second technical capability subfactor, the SSEB identified five weaknesses, one significant weakness, and two deficiencies with Trident's proposal.  Id. at 2563-

64. Again, of particular importance in this protest is the SSEB's evaluation of OV-6c models. The SSEB identified three weaknesses with Trident's model, noting that the model's narrative was inconsistent with the diagram, that the use of an external activity "disrupted the logical flow" of the model, and that the "use of event-based gateways" was inconsistent. Id. at 2564. The SSEB also identified one deficiency pertaining to the "limited scoping of the use case scenario." Id. Based on its review and evaluation, the SSEB assigned Trident a red/unacceptable rating for this subfactor. Id. at 2565. It also assigned Trident a moderate risk rating for the technical capability factor overall. Id. at 2558-59.

### C. Competitive Range and Discussions

### 1. Initial Competitive Range Determination

The SSEB briefed the Source Selection Authority ("SSA") on its findings. Id. at 4047-66. It recommended that the proposals of three offerors–CEdge, Trident, and a third company–be placed in the competitive range for discussions. Id. at 4063, 4087. That same day, the SSA approved a Competitive Range Determination document adopting the SSEB's recommendation. Id. at 4084-98. In that document, the SSA described how discussions would be conducted:

> These Offerors [in the competitive range] will be provided their initial evaluation results including their individual past performance confidence assessment rating, individual technical and staffing approach ratings, and risk ratings. Evaluation notices (EN) for each item requiring discussion will be issued. The Contracting Officer will address these issues by conducting written (and oral, if necessary) discussions and then requesting each Offeror's written response to the EN along with supporting documentation. Subsequent ENs will be issued, if required.

Id. at 4097.

### 2. Evaluation Notices

The contracting officer sent letters to each of the offerors in the competitive range, id. at 2683-84, 2689-92, along with an evaluation notice ("EN") for each weakness and deficiency identified by the SSEB, id. at 2693-860, 4099-113. Thus, Trident received eight ENs related to the second technical capability subfactor, four of which related to the weaknesses and deficiency assigned to its OV-6c model. The first–EN-TRIDENT-05–pertained to the deficiency and provided:

> Your proposal failed to address the full scope of the use case scenario.
> The limited scoping of the use case scenario (Page 67) resulted in an absence of

collapsed sub-processes and un-modeled use case extensions.[3]  In addition, the
limited scoping of the OV-6c also impacted the activities in the OV-5a and entries
into the AV-2.

> Please address the full scope of the use case for OV-6c.

Id. at 2853 (footnote added).  The remaining ENs for this subfactor related to the assessed
weaknesses.  EN-TRIDENT-06 provided:

> Your proposed OV-6c narrative was not consistent with what was modeled
> in the OV-6c diagram.  For example, the offeror's narrative stated 'the General
> Contractor obtains signed contracts' which indicates inputs; however, the model
> shows the General Contractor providing outputs for this particular activity.

> Please provide an updated OV-6c narrative and diagram which maintain
> consistency throughout.

Id. at 2854.  EN-TRIDENT-07 provided:

> Your proposed use of the external activity, A99, disrupted the logical flow
> of the OV-6c.

> Please provide an updated OV-6c that demonstrates a clear and logical
> flow.

Id. at 2855.  And, EN-TRIDENT-08 provided:

> Your proposal was inconsistent in the use of event-based gateways
> throughout the OV-6c.  For example, the pool company did not proceed to dig the
> hole (A 3.3) until a payment was received which should have been reflected in an
> event-based gateway and not an External Activity A99.

> Please provide an updated OV-6c properly utilizing event-based gateways
> where applicable.

Id. at 2856.

Similarly, CEdge received seven ENs related to the second technical capability subfactor,

---

[3]  A subprocess, "one of BPMN's most important concepts," is "an activity containing
subparts that can be expressed as a process flow."  AR 3907.  It "is simultaneously an activity, a
step in a process that performs work, and a process, a flow of activities from a start event to one
or more end events."  Id.

two of which related to the deficiencies of its OV-6c model.  The first–EN-CEDGE-04–provided:

> Your proposal failed to provide an OV-6c encompassing the entire fully dressed use case included in the solicitation.  Your proposed OV-6c only provided a small subset of the fully dressed use case.
>
> Please provide an updated OV-6c that encompasses the entire use case provided with the solicitation.

Id. at 4102.  The second–EN-CEDGE-05–provided:

> The offeror failed to use BPMN, as required on solicitation Page 118 Subfactor 2a, to develop the proposed OV-6c Event Trace Description.
>
> Please provide an OV-6c using BPMN.

Id. at 4103.  CEdge sought clarification regarding EN-CEDGE-05, asking the contracting officer whether USTRANSCOM was requesting that CEdge use a collaboration diagram, rather than a choreography diagram, for its OV-6c model.  Id. at 4114.  The contracting officer responded that CEdge was required to submit a model that complied with the designated reference materials, and the relevant reference only addressed collaboration, not choreography, diagrams.  Id. at 4103, 4114-15.

### 3.  Revised Proposals

All three offerors in the competitive range responded to the ENs and submitted revised proposals.  Id. at 2861-3600.  The SSEB reviewed the revised proposals; identified the proposals' remaining strengths, weaknesses, and deficiencies; and updated its consensus ratings.[4]  Id. at 3619-34, 4343-56.  With respect to the first technical capability subfactor, Trident remedied its one weakness, and both Trident and CEdge retained their earlier strengths and color/adjectival ratings (i.e., blue/outstanding for Trident and purple/good for CEdge).  Id. at 3622-23, 4343-44.

With respect to the second technical capability subfactor, Trident's revised OV-6c model remedied the issues raised in the ENs.  Id. at 2853-56.  In the absence of any strengths, weaknesses, or deficiencies, the SSEB assigned Trident a green/acceptable rating for this subfactor.  Id. at 3624-25.  In fact, upon reviewing Trident's revised proposal, the SSEB did not identify any weaknesses or deficiencies under the technical capability factor, id. at 3619, meaning that further discussions or proposal revisions were unnecessary, see Federal Acquisition Regulation ("FAR") 15.306(d)(3) (requiring discussions regarding significant weaknesses and

---

[4]  Although the SSEB's second round of evaluation worksheets are undated, their contents suggest that they were created after the first revised proposals were submitted.

deficiencies).  Moreover, the SSEB upgraded its risk rating of Trident's technical capability from moderate to low.  AR 3619.

CEdge's revised OV-6c model, in contrast, remained unsatisfactory.  The SSEB identified the following deficiency:  "The offeror's proposed OV-6c Event Trace Description was not developed in[ ]compliance with the BPMN 2.0 as it lacks proper sequence flow and/or sub-processes."  Id. at 4345.  Finding the "severity" of this deficiency to be "significant in nature," it did not change CEdge's red/unacceptable rating for the second technical capability subfactor.  Id. at 4346.  Moreover, it downgraded its risk rating of CEdge's technical capability from moderate to high.  Id. at 4356.

Due in part to this deficiency, the contracting officer continued her discussions with CEdge.  She issued EN-CEDGE-18, which provided:

> Your revised OV-6c was not in compliance with the BPMN 2.0 specification as indicated.  Regardless of diagram choice (choreography vice collaboration) the revised OV-6c lacked proper sequence flow and/or sub-processes.
>
> Please provide an OV-6c collaboration diagram that is in compliance with BPMN 2.0 specifications.

Id. at 4228.  CEdge responded to this EN and submitted a second revised proposal.  Id. at 4228, 4230-96.  The contracting officer and the SSEB remained dissatisfied, providing the following internal assessment of CEdge's response:

> The offeror's OV-6c collaboration diagram was not compliant with BPMN 2.0 specifications.  The OV-6c depicted some sequence flow, which was missing from the previous model, but is still incomplete.  Although messages, also known as information exchanges, were identified between pools,[5] it lacked data exchanges between performers within the pools as required by the [solicitation] reference BPMN Method and Style (Silver, page 160, figure 15-1).[6]  The subprocesses identified were linked to the technology, preventing the re-use of

---

[5] "A Pool represents a Participant in a Collaboration."  BPMN 2.0, supra note 2, at 502.

[6] Although data exchanges are depicted on the cited figure, see AR 3914, there is no indication in the excerpts from the reference included in the administrative record that data exchanges are required to be depicted on collaboration diagrams.  To the contrary, the reference considers "the flow of process data in BPMN" to be "implicit."  Id. at 3911; accord id. ("I don't use data objects very often, but it is a matter of personal style."); see also BPMN 2.0, supra note 2, at 203 (indicating that data modeling can be accomplished through the use of data objects, messages, and/or data associations).

those activities within the architecture.  For example, "Configure new irrigation equipment" is linked to irrigation, but if it had been "Configure equipment" the activity could have been reused in the different lanes by different performers (surveyor or landscaper).[7]  The model also grouped pools by performer and not process.  For example, one pool was identified as "Contractors" but should have been the name of the process, such as "Pool Installation".  The offeror[']s approach conflicts with guidance provided in Silver, page 12, paragraph 4.  "You sometimes see pools labeled with the name of an organization [performer], but for pools that contain activity flows–some don't, as we will see later–it's best practice to label them with the name of the process."  As a result, the offeror's OV-6c lacked proper sequence of activities among performers.  According to the use case, the landscaper had to perform some activities then return after pool installation to perform more activities.  The offeror's sequencing didn't have the landscaper perform any activities until the pool was installed.

Id. at 4228 (final alteration in the original) (footnotes added).

### 4.  Removal of CEdge From the Competitive Range

After receiving and reviewing the second revised proposals submitted by CEdge and the third offeror in the competitive range, the SSEB briefed the SSA.  The SSEB indicated that Trident had resolved all of its ENs in the first round, id. at 4400; that the proposal of the third offeror in the competitive range had one weakness, one significant weakness, and four deficiencies after the second round of ENs, id. at 4396; and that CEdge's proposal had one deficiency after the second round of ENs, leading the SSEB to conclude that CEdge had not "demonstrate[d] the understanding nor the discipline to apply the standardized modeling methodologies use[d] by [the procuring agencies] to define and document requirements," id. at 4395.  The SSEB ultimately recommended that the proposals of CEdge and the third offeror be removed from the competitive range, leaving only Trident to compete for the contract.  Id. at 4411, 4413.

The SSA had two concerns with the SSEB's recommendation.  First, the proposals of the two offerors recommended for exclusion "had good technical ratings in all subfactors" except for the second, for which both proposals received red/unacceptable ratings, rendering them "unawardable."  Id. at 4415.  Second, these two offerors proposed the "lowest labor rates and overall prices," which, given the existing "fiscally constrained environment," might prevent the government from obtaining the best value if their proposals were removed from the competition. Id.  Because of these concerns, the SSA sought advice from an outside consultant employed by the MITRE Corporation.  Id. at 4115-16.  She provided the consultant with the submission requirements and evaluation criteria set forth in the solicitation, the four reference materials

---

[7]  A lane is "[a] partition that is used to organize and categorize activities within a Pool." BPMN 2.0, supra note 2, at 501.

pertinent to the second technical capability subfactor identified in the solicitation, the use case, and the three offerors' most recent technical proposals.  Id.  She did not provide the consultant with the SSEB's evaluation worksheets or the ENs.  Id. at 4115.

The consultant prepared a memorandum containing an analysis of the models submitted by the three offerors in the competitive range.  Id. at 4416-17.  With respect to CEdge's models, he provided the following critique:

A. Notes:
- Extensions, Technology, and Data List line items–not incorporated
- Called out Main Success line items in AV-2, but activity-descriptions not aligned well or missing within the OV-6c and OV-5c
  - For example, line items 20 and 22 were to be done by the respective pool and fence contractors, but these were included in Activity 1.1 which is before the contracts are awarded in OV-6c
  - Line item 21 was called out in the OV-6c (activity 2.1), but line items 20 and 22 are missing
  - Some activities involved contractors, but were bundled in project manager which is not correct
    - For example, can't approve a bid unless one receives it from a contractor (OV-6c, Activity 1.1, 1.5)
    - Partial payments included after project is completed which is not the correct event-trace (Activity 1.7) per Government use case

    . . . .

B. Discussion
- Did the Government ask CEdge why extensions, technology and data list not used?  Do they understand how to use/apply this information?
- Not sure they understood the relationship between Grandma and the contractors
- Event trace was incorrect/incomplete and did not reflect the use case study requirements

C. Summary
- Weak submission
- Incomplete architecture products and overly simplified
- Architecture products appear to communicate limited architecture knowledge and experience–lots of risk with this use case architecture response

Id. at 4416-17.  With respect to Trident's models, the consultant wrote:

-12-

A. Notes:
- First pass–no errors found
- Accounted for all Extensions

B. Discussion
- AV-2 well written and uses authoritative sources to define activities
- Excellent attention-to-detail between AV-2, OV-5a, and OV-6c
- OV-6c had the appropriate level-of-detail, sequence, and was well organized

C. Summary
- By far the best architecture submission–bidder understands both the "art and science" of producing viable architectures
- Quality of submission is very professional

Id. at 4417-18.  Overall, the consultant concluded that the models submitted by CEdge and the third offeror "were weaker submissions and demonstrated a lack of understanding of the fundamental architectural concepts needed."  Id. at 4418.  He shared these findings with the SSA. Id. at 4415, 4418.

Thereafter, the SSA approved a new Competitive Range Determination document.  Id. at 4433-41.  The document contains an analysis of CEdge's proposal; portions relevant to this protest are as follows:

1. C-Edge's . . . Technical Proposal . . . .

. . . .

b. Subfactor 2 - Enterprise Architecture Development:  C-Edge did not meet the technical requirements for this Subfactor after two rounds of discussions.  All weaknesses/significant weaknesses and deficiencies were resolved with the exception of EN-CEDGE-05 and subsequent EN-CEDGE-18.

(1) EN-CEDGE-05 was issued because the OV-6c model was not created using Business Process Model Notation (BPMN) as required by the [solicitation].  Their response to this EN was not adequate and subsequent EN-CEDGE[-]18 was issued.  The response submitted for EN-CEDGE-18 did not resolve the issues identified.  . . .

(2) The purpose of the use case and architectural business process modeling exercise was to demonstrate an offeror's level of

-13-

expertise, discipline with architecture concepts (consistency and attention to detail) and overall understanding of fundamental architecture concepts needed to support a robust and evolving enterprise.  Based on the repeated errors, CEdge did not demonstrate the level of expertise, discipline, or understanding to apply the standardized modeling methodologies required by [the procuring agencies] to define and document requirements.  The use case provided was a simple project compared to the work that will be required by this contract.  While the solicitation only required 3 models, a normal IT architecture can include 30 different models.  Architecture models provide the backbone for engineering decisions and the blue print for information technology solutions.  Flawed logic and documentation of requirements results in flawed engineering of technical solutions which impairs our ability to respond and support the warfighter.  As mobility and sustainment operations are increasingly dependent on technology, flawed solutions mean critical cargo will not be delivered, surface and air missions will not be executed, and planes will not fly.

. . . .

e. Technical Risk:  At the end of discussions CEdge has an unresolved deficiency in architecture, which is the foundation for the engineering of enterprise systems.  As a result, CEdge's Technical Risk was changed from Moderate to High, as its proposed approach is likely to cause significant disruption of schedule, increased cost, or degradation of performance.  CEdge is unlikely to overcome any difficulties, even with special contractor emphasis and close Government monitoring.

. . . .

4. . . . . CEdge's revised [total evaluated price] is $56,198,461.68.

5. C-Edge's revised proposal is not one of the most highly rated proposals . . . .  In total, C-Edge received seven (7) Strengths, and one (1) Deficiency for their Technical and Staffing proposals.  C-Edge received a Past Performance Confidence Assessment Rating of Satisfactory and has the lowest [total evaluated price]; however they are technically unacceptable due to the Deficiencies in Subfactor 2.  While CEdge has more strengths overall than any other offeror, their inability to produce a fully integrated architecture model for a simple scenario is fatal.  As noted above, sound engineering decisions and IT solutions are dependent upon the architecture model.  The evaluation notice provided CEdge with information specific enough to allow them to resolve the issues.  Considering

the fundamental, or basic, errors included in the model submitted, further ENs would have required the Government to specifically call out each instance where CEdge's model failed to conform to the requirements of the solicitation (e.g., the landscaper tasks are not sequenced per the Use Case).  To do so would have negated the purpose of the use case and architectural business process modeling exercise which was to demonstrate an offeror's level of expertise, discipline with architecture concepts (consistency and attention to detail) and overall understanding of fundamental architecture concepts needed to support a robust and evolving enterprise.

Id. at 4435-37 (emphasis removed).  Ultimately, after reviewing the recommendation of the SSEB and the consultant's analysis, the SSA approved the removal of CEdge and the third offeror from the competitive range.  Id. at 4415, 4440.  She expressed confidence that "the SSEB had full and meaningful discussions with all Offerors" and that "a competitive range of 1 [was] in the Government[']s best interest."  Id. at 4415.

The following day, the contracting officer notified Trident that discussions had concluded and invited Trident to submit a final revision to its proposal.  Id. at 3684.  She also notified CEdge that discussions had concluded and that because its proposal was "no longer amongst the most highly qualified," it was "removed from the competitive range."  Id. at 4443.  The contracting officer summarized CEdge's ratings in the notification letter, and provided copies of the SSEB's evaluation worksheets for CEdge's review.  Id.

### D.  Debriefing, Initial Protest, and Contract Award

CEdge immediately requested a debriefing from the contracting officer, who responded in writing to CEdge's questions:

Q2. . . . [I]s the deficiency on the OV-6c based on the "proper" sequence flow?  The deficiency noted continues to be vague, and does not provide the specificity needed to provide a proper response.  What are the specific items in our OV-6c that you find non-compliant?

Government Answer:  The Government disagrees that the deficiency was vague.  EN-CEDGE-18 specifically advised that your revised OV-6c "lacked proper sequence flow".  This is a commonly used term and should have been sufficient for you to correct the deficiency.  Furthermore, if you felt the EN was so vague that you couldn't provide an adequate answer, then you had the opportunity to request clarification as you did during the first round of discussions.  No clarification was requested and your response to EN-CEDGE-18 indicated your proposal had been updated with a revised OV-6c "to address the issue listed in the evaluation notice".

-15-

. . . .

Q3. We produced the OV-6c using the SparxEA tool which uses business
rules to ensure artifacts are produced in compliance with BPMN 2.0 standards.
Further, our OV-6c was verified as compliant through an independent review by
the author of the original guidance document for creating OV-6c diagrams using
BPMN. We are highly confident that our OV-6c is BPMN 2.0 compliant. What
is the specific reference you used to define "proper" in relation to the sequence
flow and conclude that our OV-6c is non-compliant?

Government Answer: The four reference materials used by the evaluation
team to review the submissions for subfactor 2 are listed in the solicitation,
Section L-4, Factor l, paragraph (b).

. . . .

Q5. If your assessment is based on a misinterpretation of the use case
(correct sequence of building a pool activities), then we were never afforded the
opportunity to address that situation. Is the rating based on the assessment that
one or more sub-processes is out of sequence? As an example, did we incorrectly
sequence "Install Fence" before "Install Porch"?

Government Answer: See question 2 above. The sequence flow
deficiency was addressed in EN-CEDGE-18.

. . . .

Q9. We would like to understand your basis for the change in risk rating
from moderate to high[.]

Government Answer: Based upon the initial proposal review the Source
Selection Evaluation Board thought the deficiencies were due to a lack of
understanding of the requirement and could be addressed through discussions.
However, after two rounds of discussions it became evident that you had not
sufficiently demonstrated a knowledge of architecture necessary to develop
architecture artifacts. As a result, your risk rating was changed from moderate to
high.

Id. at 3717-18. Dissatisfied with these responses, CEdge lodged a protest with the Government
Accountability Office ("GAO"). Id. at 3720-36. The GAO denied CEdge's protest in an April 1,
2014 decision. Id. at 4476-82. USTRANSCOM ultimately awarded the contract to Trident on
April 10, 2014. Id. at 4508. Trident's total evaluated price for the contract, which included a

six-month extension of services, was $74,166,938.31, id., approximately $18 million more than CEdge's total evaluated price.

## E.  Proceedings in the United States Court of Federal Claims

On May 8, 2014, CEdge filed a protest in this court challenging the removal of its proposal from the competitive range.  In its subsequently filed amended complaint, CEdge asserts three claims for relief.  First, it contends that it was improper for USTRANSCOM to assign a deficiency for its OV-6c model and then remove its proposal from the competitive range.  Am. Compl. ¶¶ 102-22.  Second, it avers that discussions were not meaningful and were misleading and unequal.  Id. ¶¶ 123-51.  Third, it alleges that USTRANSCOM's evaluation of the first technical capability subfactor was unequal.  Id. ¶¶ 152-60.  CEdge seeks a declaration that USTRANSCOM acted improperly under each claim for relief and an injunction directing USTRANSCOM to "suspend Trident's contract, reinstate CEdge into the competitive range, make a rational best value decision on the basis of the final proposals, and if CEdge represents the best value . . . , cancel the award to Trident and award the contract to CEdge."  Id. at 30.

Trident intervened and the parties all moved for judgment on the administrative record.  Upon the completion of briefing, the court heard argument and is now prepared to rule.

## II.  DISCUSSION

Each party has filed a motion for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), urging the court to enter judgment in its favor.  In ruling on such motions, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)[8]).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record."  Bannum, Inc., 404 F.3d at 1356.

## A.  Standard of Review

In a bid protest, the Court of Federal Claims reviews the challenged agency action pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4) (2012).  Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"

---

[8]  The decision in Bannum was based upon then-RCFC 56.1, which was abrogated and replaced by RCFC 52.1.  RCFC 52.1 was designed to incorporate the decision in Bannum.  See RCFC 52.1, Rules Committee Note (June 20, 2006).

Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under this standard, the court "may set aside a procurement action if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  Centech Grp., Inc., 554 F.3d at 1037 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

Procurement officials "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process."  Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332 (internal quotation marks omitted).  Thus, when a protester challenges the procuring agency's decision as irrational, the court's review is "highly deferential" to the agency's decision, Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and "[t]he court is not empowered to substitute its judgment for that of the agency," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  "Accordingly, the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332-33 (citation and internal quotation marks omitted); accord Advanced Data Concepts, Inc., 216 F.3d at 1058 ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").  When a protester claims that the procuring agency's decision violates a statute, regulation, or procedure, it must show that the violation was "clear and prejudicial."  Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1333 (internal quotation marks omitted).

### B. CEdge's First Claim for Relief–the Assignment of a Deficiency

In its first claim for relief, CEdge alleges that USTRANSCOM erred by assigning it a deficiency for its OV-6c model and subsequently removing it from the competitive range.  In advancing this argument, CEdge relies on the FAR's definition of deficiency:  "[A] material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level."[9]  FAR 15.001.  According to CEdge, the issues identified by USTRANSCOM with its OV-6c model were not material; therefore, a deficiency assessment was inappropriate.

The deficiency that led to the removal of CEdge's proposal from the competitive range was communicated to CEdge in EN-CEDGE-18.  In that EN, USTRANSCOM requested an OV-6c collaboration diagram compliant with the BPMN 2.0 specification, explaining that CEdge's revised diagram was not BPMN 2.0-compliant and "lacked proper sequence flow and/or sub-processes."  AR 4228.  A straightforward reading of this EN indicates that USTRANSCOM believed that the activities depicted in CEdge's revised OV-6c model may have been out of

---

[9] "Deficiency" was not defined in the solicitation.

sequence and that CEdge may have omitted one or more subprocesses from the model. USTRANSCOM's comment regarding BPMN 2.0 noncompliance and request that CEdge submit a BPMN 2.0-compliant diagram do not, as CEdge argues, alter this reading. A reasonable offeror, informed that its model "lacked proper sequence flow and/or sub-processes," would have compared its model with the scenario described in the use case to verify that its model reflected the proper sequence of events and contained all required subprocesses. Moreover, if CEdge had been confused by USTRANSCOM's comments, it could have sought clarification, as it did during the first round of discussions.

Issues remained with the second revised OV-6c model that CEdge submitted in response to EN-CEDGE-18. According to USTRANSCOM, CEdge's model continued to be noncompliant with the BPMN 2.0 specification and was still incomplete. USTRANSCOM specifically remarked on the lack of data exchanges, improper linking of subprocesses, and the grouping of pools by performer rather than by process, which resulted in the improper sequence of activities by the performers. Indeed, USTRANSCOM's evaluation was consistent with the findings of the consultant who independently reviewed CEdge's models without the benefit of the SSEB's evaluation worksheets or the resulting ENs; the consultant noted that CEdge's OV-6c model did not contain the extensions set forth in the use case or some of the steps described in the use case's main success scenario.

As set forth in the solicitation, offerors were required to submit three integrated models. All three models were to be based on the use case and the applicable listed references. And, the OV-6c model was to be developed using BPMN. CEdge argues that its proposal satisfied these requirements, contending that there was only one, minor error in its OV-6c model–the sequencing error with the landscaper. Thus, from CEdge's point of view, there was no material failure to meet the solicitation's requirements; rather, the only issue was whether its error was significant enough to constitute a weakness.[10]  Significantly, however, CEdge ignores the other

_____

[10]  CEdge suggests that USTRANSCOM was expressly prohibited from assigning a deficiency for the second technical capability subfactor so long as an offeror's proposal contained an OV-6c model based on BPMN standards that was fully integrated with the other two models described in the solicitation. The solicitation does not so limit USTRANSCOM. Although section M of the solicitation indicated that the measure of merit for this subfactor would be met by the submission of a "fully integrated model subset based on" the use case, AR 758, USTRANSCOM possessed the discretion to determine what constituted a "fully integrated model subset" and how much of the use case needed to be represented in the "fully integrated model subset." See Forestry Surveys & Data v. United States, 44 Fed. Cl. 493, 499 (1999) ("[A]gency evaluation personnel are given great discretion in determining the scope of an evaluation factor."). In fact, in the first round of discussions, USTRANSCOM made it perfectly clear that it expected the entirety of the use case to be represented in the models. See AR 2853 (EN-TRIDENT-05), 4102 (EN-CEDGE-04). Moreover, it is perfectly reasonable for USTRANSCOM to evaluate the accuracy and completeness of the offerors' models; inherent in the requirement that these models be submitted is the requirement that these models meet certain

flaws identified by USTRANSCOM and its consultant–e.g., the model's lack of completeness, the improper linking of subprocesses, and the grouping of pools by performer rather than process. It is readily apparent from the evaluations and comments of the SSEB, the contracting officer, and the SSA that they considered the multiple flaws in CEdge's second revised OV-6c model to constitute a failure to satisfy the solicitation's requirements.  And, the fact that USTRANSCOM assigned a deficiency for CEdge's OV-6c model means that it deemed CEdge's failure to satisfy the solicitation's requirements to be material.  Such a determination was within USTRANSCOM's discretion, and the court will not second-guess it.  See E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996).

As CEdge represents, USTRANSCOM removed CEdge's proposal from the competitive range as a result of the deficiency and associated red/unacceptable rating that it assigned to CEdge for CEdge's flawed OV-6c model.  See AR 4437 (noting that CEdge's proposal was "technically unacceptable" due to the deficiency in the second technical capability subfactor). Because USTRANSCOM's assignment of a deficiency had a rational basis, USTRANSCOM's removal of CEdge's proposal from the competitive range also had a rational basis.[11] Accordingly, CEdge cannot prevail on its first claim for relief.

## C.  CEdge's Second Claim for Relief–Discussions

CEdge may still succeed on the merits of its protest, however, if it proves its allegation that USTRANSCOM conducted flawed discussions.  Discussions "are undertaken with the intent of allowing the offeror to revise its proposal," FAR 15.306(d), with the "primary objective of . . . maximiz[ing] the Government's ability to obtain best value," FAR 15.306(d)(2).  The FAR specifically addresses the scope of discussions:

> At a minimum, the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an

---

standards of quality.  See Bean Stuyvesant L.L.C. v. United States, 48 Fed. Cl. 303, 321 (2000) (noting that "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors" (internal quotation marks omitted)).

[11]  FAR 15.306(d)(5) expressly permits the removal of a proposal from the competitive range if the offeror "is no longer considered to be among the most highly rated offerors being considered for award . . . ."  See also FAR 15.306(c)(3) (noting that "[i]f the contracting officer . . . decides that an offeror's proposal should no longer be included in the competitive range, the proposal shall be eliminated from consideration for award").  Accordingly, CEdge's argument that USTRANSCOM was prohibited from removing its proposal from the competitive range, first raised in its reply in support of its motion for judgment on the administrative record, lacks merit.

opportunity to respond.  The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award.  However, the contracting officer is not required to discuss every area where the proposal could be improved.  The scope and extent of discussions are a matter of contracting officer judgment.

FAR 15.306(d)(3).  CEdge specifically contends that the discussions conducted by USTRANSCOM were not meaningful, and were misleading and unequal.

### 1. Discussions Were Meaningful

CEdge first argues that discussions were not meaningful because USTRANSCOM failed to advise it of the specific sequencing error in its OV-6c model.  For discussions to be meaningful, they must "generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit."  Advanced Data Concepts, Inc. v. United States, 43 Fed. Cl. 410, 422 (1999) (internal quotation marks omitted), aff'd, 216 F.3d at 1054.  Ultimately, however, the scope of discussions is left to the contracting officer's discretion.  See FAR 15.306(d)(3); Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 384 (2003), aff'd, 365 F.3d at 1345.  Here, the administrative record reflects that USTRANSCOM's discussions with CEdge were meaningful.

USTRANSCOM conducted two rounds of discussions with CEdge.  In the first round, USTRANSCOM advised CEdge that its OV-6c model was not a collaboration diagram, as required by the relevant reference specified in the solicitation.  Because CEdge did not use the proper type of diagram for its OV-6 model, there would have been no reason or opportunity for USTRANSCOM to identify more specific concerns at that time.  Because USTRANSCOM led CEdge to the area of its proposal that required correction, this round of discussions was meaningful.

In response to USTRANSCOM's comments in the first round of discussions, CEdge submitted a new OV-6c model with its revised proposal.  USTRANSCOM reviewed the revised model and advised CEdge that it had identified the following issues:  (1) the model did not comply with the BPMN 2.0 specification and (2) the model "lacked proper sequence flow and/or sub-processes."  AR 4228.  This communication provided CEdge with notice that it should focus its attention on its model's BPMN 2.0 compliance, sequence flow, and subprocesses.  More specific guidance was unnecessary under the applicable precedent.[12]  Indeed, as noted above, a

---

[12]  The fact that USTRANSCOM identified more specific issues with the next revised OV-6c model submitted by CEdge is, contrary to CEdge's suggestion, irrelevant.  Given the broad categorization of the issues that USTRANSCOM identified with CEdge's first revised OV-6c model, it is reasonable to conclude that more issues existed with the model than could be

reasonable offeror receiving this communication would have compared its model with the scenario described in the use case to verify that its model reflected the proper sequence of events and contained all required subprocesses. Because USTRANSCOM disclosed to CEdge the aspects of the model that required correction, this round of discussions was meaningful.

After this second round of discussions, CEdge submitted another revised proposal that included a newly revised OV-6c model. USTRANSCOM evaluated CEdge's second revised OV-6c model and determined that while some sequence flow issues had been resolved, the model remained incomplete. These comments were not disclosed to CEdge at the time they were made, presumably because the contracting officer determined that no further discussions were warranted, a decision well within her discretion. See Banknote Corp. of Am., 56 Fed. Cl. at 384. In the absence of any discussions, no meaningfulness inquiry can be performed.

In sum, CEdge has not established that the discussions conducted by USTRANSCOM concerning its OV-6c model were not meaningful.

## 2. Discussions Were Not Misleading

CEdge next argues that discussions were misleading. Discussions are misleading when a procuring agency issues "incorrect, confusing or ambiguous" communications that misdirect an offeror attempting to revise its proposal. DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 670 (2010). Here, CEdge contends that EN-CEDGE-18 was misleading because its contents implied that USTRANSCOM's only concern with CEdge's revised OV-6c model was one of BPMN compliance. CEdge's contention lacks merit.

As noted above, EN-CEDGE-18 provided:

> Your revised OV-6c was not in compliance with the BPMN 2.0 specification as indicated. Regardless of diagram choice (choreography vice collaboration) the revised OV-6c lacked proper sequence flow and/or sub-processes.
>
> Please provide an OV-6c collaboration diagram that is in compliance with BPMN 2.0 specifications.

---

practically communicated to CEdge. In such circumstances, USTRANSCOM was under no obligation to identify every issue with specificity. See Advanced Data Concepts, Inc., 43 Fed. Cl. at 422 (noting that "discussions should be as specific as practical considerations permit" (emphasis added)); see also D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 40 (2011) ("[T]he procuring agency is not required to address in express detail all inferior or inadequate aspects of a proposal." (internal quotation marks omitted)).

AR 4228.  Given the contents of the first paragraph of the EN, the second paragraph is reasonably read as a request for a BPMN 2.0-compliant collaboration diagram that contains proper sequence flow and subprocesses.  There is nothing incorrect, confusing, or ambiguous about this communication; USTRANSCOM adequately alerted CEdge to its assessment that the revised OV-6c model had issues beyond BPMN compliance.

### 3.  Discussions Were Equal

In addition to contending that discussions were not meaningful and were misleading, CEdge asserts that discussions were unequal.  The FAR prohibits contracting officers from favoring "one offeror over another" when conducting discussions.  FAR 15.306(e)(1).  Consequently, although contracting officers should tailor discussions to each offeror's proposal, FAR 15.306(d)(1), they should not "inform some offerors of a concern . . . while staying silent with respect to identical issues in other offerors' proposals," Ashbritt, Inc. v. United States, 87 Fed. Cl. 344, 372 (2009).  Here, CEdge alleges that in conducting discussions regarding the offerors' OV-6c models, USTRANSCOM provided Trident with much more specific comments than it provided to CEdge.  Although CEdge's allegation is superficially compelling, a closer examination reveals its flaws.

When comparing the discussions that USTRANSCOM conducted with CEdge to those conducted with Trident, it is important to note that upon evaluating the two offerors' initial OV-6c models, USTRANSCOM found them to be of vastly different quality.  CEdge submitted a model that used the incorrect type of diagram, foreclosing USTRANSCOM from being able to provide more specific comments.  In contrast, Trident submitted a model using the correct type of diagram, which allowed USTRANSCOM to be more specific in its comments.  There can be no dispute that USTRANSCOM properly tailored this first round of discussions to each proposal and treated the offerors as equally as possible given the disparity in their submissions.

The parties subsequently submitted revised OV-6c models.  USTRANSCOM concluded that Trident had resolved the issues with its initial model.  CEdge's revised model, however, was problematic.  Although CEdge used the correct type of diagram, USTRANSCOM identified other issues related to compliance with the BPMN 2.0 specification and to sequence flow/subprocesses.  Given this broad categorization of the issues with CEdge's revised model, it is reasonable to conclude that USTRANSCOM identified more issues with the model than it could practically communicate to CEdge.  This conclusion is supported by USTRANSCOM's evaluation of CEdge's second revised OV-6 model, which reflects that the issues USTRANSCOM had identified with CEdge's first revised OV-6c model had been reduced in number.  See AR 4228 (noting that CEdge's second revised OV-6c model included some sequence flow that had been missing from CEdge's first revised OV-6c model).  In light of the number of issues it identified with CEdge's first revised model, USTRANSCOM properly tailored its discussions with CEdge.  Accordingly, the fact that USTRANSCOM was not more specific in its second round of discussions with CEdge does not render those discussions unequal.

### D.  CEdge's Third Claim for Relief–Disparate Evaluations

CEdge's final contention is that USTRANSCOM's evaluation of the first technical capability subfactor was unequal.  However, even if CEdge was able to prove this allegation, it could not prevail in this protest.  The court has concluded that USTRANSCOM did not err in removing CEdge's proposal from the competitive range based on the deficiency it assigned for CEdge's OV-6c model.  This deficiency rendered CEdge's proposal unacceptable for award, and any changes in the evaluation of another factor or subfactor could not change this fact.  Consequently, the court need not assess the merits of CEdge's third claim for relief.

## III.  CONCLUSION

For the foregoing reasons, the court concludes that CEdge has not established that USTRANSCOM acted irrationally in assigning it a deficiency for its OV-6c model, removing its proposal from the competitive range, or conducting discussions.  As a result, CEdge is unable to succeed on the merits of its protest.  The court therefore **DENIES** CEdge's motion for judgment on the administrative record and **GRANTS** defendant's and defendant-intervenor's cross-motions for judgment on the administrative record.  CEdge's protest is **DISMISSED** with prejudice.  No costs.  The clerk shall enter judgment accordingly.

The court has filed this ruling under seal.  The parties shall confer to determine proposed redactions agreeable to all parties.  Then, by **no later than Friday, August 8, 2014**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge